## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CENTRAL STATES, SOUTHEAST )
AND SOUTHWEST AREAS )
HEALTH AND WELFARE FUND, )
and CHARLES A. WHOBREY, )
Trustee, )
                       )   No.  17 C 6275
          *Plaintiffs,* )
                       )   Judge Virginia M. Kendall
       v. )
                       )
SHELBY L. HAYNES, an Individual, )
N. GERALD DICUCCIO, ESQ., )
an Individual, and BUTLER, )
CINCIONE & DICUCCIO, )
an Ohio Partnership, )
                       )
      *Defendants.* )

## MEMORANDUM OPINION AND ORDER

In 2013, doctors performing a gallbladder removal surgery on Shelby Haynes injured her, necessitating a second surgery three days later.  Haynes incurred $312,286.50 in medical expenses as a result, and her insurer—Central States, Southeast and Southwest Areas Health and Welfare Fund (together with its trustee, Charles Whobrey, "Central States")—footed the bill.  Haynes, represented by Butler, Cincione & DiCuccio, subsequently sued the doctors that performed the first surgery and the hospital where they performed it.  In 2017, the parties settled that lawsuit for $1,500,000 and Haynes's law firm accepted a mailed check on her behalf.

After the settlement, Haynes and her counsel refused to reimburse Central States the amount it previously covered for her, so Central States sued them under

the Employee Retirement Income Security Act of 1974 (ERISA) alleging it had an equitable lien on the settlement fund held by the firm and seeking to impose a constructive trust on it. The parties cross-moved for summary judgment in early 2019 arguing the material facts are undisputed therefore entitling them to judgment as a matter of law. (Dkt. 96, 102.) Because the terms of the health insurance contract—including the reimbursement provision—bind Haynes, and neither she nor her attorneys can assert any equitable defense consistent with the contract, the Court grants Central States' motion (Dkt. 96), denies the defendants' cross-motion (Dkt. 102), and enters summary judgment for Central States.

## BACKGROUND

On December 11, 2013, 18-year-old Shelby Haynes underwent surgery at Bon Secours Kentucky Health Systems in Ashland, Kentucky to remove her gallbladder. (Dkt. 108 ¶ 11; Dkt. 113 ¶ 8.) During that surgery, Haynes sustained an injury to her common bile duct (a tube that connects to the gallbladder). (Dkt. 113 ¶ 9.) On December 14, 2013, Haynes had a second surgery performed on her at the University of Kentucky Medical Center to repair the damage to her common bile duct. (Dkt. 108 ¶ 12; Dkt. 113 ¶ 10.) Haynes incurred $312,286.50 in medical expenses because the first surgery went wrong. (Dkt. 108 ¶ 13.) Central States paid out health insurance benefits for this treatment because Haynes was a covered beneficiary under her father's ERISA-governed employee welfare plan. (Dkt. 108 ¶¶ 14, 29, 32; Dkt. 110 ¶ 2; Dkt. 113 ¶ 4.)

**The Fund and the Plan Documents**

Central States annually provides every participant in the Plan—including Haynes and her father—with a Summary of Benefits and Coverage (SBC) because federal law requires it to. (Dkt. 121 ¶ 2.) The SBC describes the participants' coverage and gives them information on how to obtain a copy of the Plan, which is readily available online and can also be supplied in writing. *Id.*

Central States also sends all new enrollees a copy of the Summary Plan Description (SPD) along with their enrollment form. *Id.* ¶ 3. With respect to the enrollment form, Central States received a version signed by Haynes's father in August 2008, in which he elected coverage for himself and his family, including Haynes. *Id.* ¶ 5. In addition to sending the SPD upon enrollment, Central States periodically distributes copies of the SPD as the law requires it to. *Id.*

Both Shelby Haynes and her father do not dispute receiving the SPD, although they never received a copy of the Plan. *Id.* Central States' records indicate that it sent Haynes's father a copy of the SPD in June 2008 and then again in November 2013. *Id.* ¶ 4. The SPD states that "'[a]ll information in this booklet . . . is subject to the terms of the actual Health and Welfare Plan document.'" *Id.* ¶ 10. It also asserts that "[t]he Plan has a full right of subrogation and/or reimbursement each time you and/or one or more of your covered dependents receive benefit payments by the Plan for any physical or mental condition or injury that was or may have been caused by any person." *Id.* ¶ 11. The SPD continues, declaring: "The Plan is entitled to full reimbursement, from your settlement or other recovery, of all of its benefit payments

for care and treatment of injuries. That full reimbursement is not reduced by any attorneys' fees or other costs you incur in obtaining your settlement or other recovery." *Id.*

For its part, the Plan itself states the following regarding subrogation and reimbursement:

> The Fund, whenever it makes any payment for any benefits on behalf of a Covered Individual or other person related to any illness, injury or disability (collectively and separately "Disability") of the person, is immediately subrogated and vested with subrogation rights ("Subrogation Rights") to all present and future rights of recovery ("Loss Recovery Rights") arising out of the Disability which that person . . . may have. The Fund's Subrogation Rights extend to all Loss Recovery Rights of the Covered Individual. The Loss Recovery Rights of the Covered Individual include, without limitation, all rights based upon one or more of the following:
>
> (1) Any act or omission by any person or entity...
>
> (2) Any policy . . . for any insurance, indemnity or reimbursement . . . and also including every other form of no-fault liability insurance, personal-injury protection insurance, financial responsibility insurance, uninsured and/or underinsured motorist insurance and any casualty liability insurance or medical payments coverage . . .
>
> *
>
> The right, at any time after the Fund becomes vested with Subrogation Rights, to prosecute a civil action against the Covered Individual and/or against any person and/or other entity (including any insurance company) which the Fund claims to be responsible, in whole or in part, to provide payment or reimbursement to the Fund of the unrecovered amount of the Fund's Subrogation Rights.
>
> *
>
> The Covered Individual shall fully cooperate with the Fund in enforcement of the Fund's Subrogation Rights, shall make prompt, full, accurate and continuous disclosures to the Fund's representatives of all information about all circumstances of his/her Disability and about all

other specifics of his/her Loss Recovery Rights . . . and shall refrain from any act or omission that would to any extent prejudice or impair the Fund's Subrogation Rights or seek to prejudice or impair the Fund's Subrogation Rights.

\*

The payment by the Fund for any benefits on behalf of a Covered Individual related to his/her Disability, and the simultaneous creation of the Fund's Subrogation Rights to the full extent of present and future payments, shall by itself (without any documentation from, or any act by, the Covered Individual) result in an immediate assignment to the Fund of all right, title and interest of the Covered Individual to and in any and all of his/her Loss Recovery Rights to the extent of such payments, and said payment by the Fund on behalf of a Covered Individual shall be deemed to constitute the Covered Individual's direction to his/her attorneys and other representatives to reimburse the full amount of the Fund's Subrogation Rights, from any settlement proceeds or other proceeds (collectively "Proceeds") which are paid to the attorneys or representatives for or on behalf of the Covered Individual, before the Covered Individual receives any Proceeds in full or partial satisfaction of his/her Loss Recovery Rights, and before any fees or expenses are paid, including attorneys' fees.

\*

The Fund is authorized but not required to bring actions in enforcement of the Fund's Subrogation Rights, including direct actions (as subrogee or otherwise) against any person, entity, or Responsible Person which the Fund claims to be responsible, in whole or part, to provide payment or compensation or reimbursement to the Fund of the unrecovered amount of the Fund's Subrogation Rights, and including actions against any person, entity, or Responsible Person to enjoin any act or practice which violates any terms of the Plan, the Fund's Subrogation Rights and/or to obtain other appropriate equitable relief to redress such violations and/or to enforce the Fund's Subrogation Rights. A responsible Person is any person or entity, including attorneys or other representatives of a Covered Individual in any claim for damages for a Disability suffered by the Covered Individual, resulting from any act or omission of another person or entity, and who received any Proceeds, by way of settlement or award from such claim for damages. If such an action is filed by the Fund and the Fund prevails in any amount on any of its claims, all persons, entitles and Responsible Person(s) against whom such action is filed shall jointly and severally be responsible for all costs

and expenses, including attorneys' fees, incurred by the Fund in connection with or related to such civil action.

*

> The Fund is entitled to receive payment and reimbursement in the full amount of the Fund's Subrogation Rights before the Covered Individual receives any Proceeds in full or partial satisfaction of his/her Loss Recovery Rights and before any fees or expenses are paid, including attorneys' fees. If the Fund is vested with Subrogation Rights pursuant to this Section 11.14, then, before the Covered Individual receives any Proceeds, the Covered Individual, and every person and entity that provides any recovery of Proceeds to or on behalf of a Covered Individual, are obligated to cause all such Proceeds to be paid primarily and directly to the Fund until the Fund has received full payment and reimbursement of the Fund's Subrogation Rights.

(Dkt. 108 ¶¶ 4–9.) Finally, Section 11.14(f) of the Plan explains that Central States "may assert a lien, for recovery of the Fund's Subrogation Rights against any person or entity." *Id.* ¶ 10.

On January 13, 2014, Central States gave notice to N. Gerald DiCuccio, counsel for Haynes, that it expected Haynes to fully reimburse it should she later recover for her injuries from any third parties. (Dkt. 108 ¶ 29; Dkt. 113 ¶ 114.) Per the Plan, full reimbursement means that:

> Subsection (g) has long provided in part that, unless otherwise expressly agreed in a specific instance, "[t]he Fund shall not be financially responsible for any expenses, including attorneys' fees, incurred by or on behalf of a Covered Individual in the enforcement of his/her Loss Recovery Rights . . . " <u>The Fund's Subrogation Rights are not in any way subordinate to or affected by any 'common fund' principle or factor</u> – sometimes described as the equitable concept of a 'common fund' which governs the allocation of attorneys' fees in any case in which a lawyer hired by one party creates through his/her efforts a fund in which others are entitled to share as well – <u>the acceptance of plan benefits from the Fund entirely subordinates the Loss Recovery Rights of the Covered Individual to the Subrogation Rights of the Fund (without any 'common fund' reduction or other reduction of those Subrogation Rights)</u>.

(Dkt. 121 ¶ 9 (emphasis in original).)

**Haynes's Settlement with the Hospital**

Haynes, represented by Butler, Cincione & DiCuccio, sued the first hospital and its surgical team for medical malpractice on December 8, 2014 in Kentucky state court. (Dkt. 108 ¶ 16; 113 ¶ 16.) The parties settled that lawsuit for $1,500,000 during the summer of 2017. (Dkt. 108 ¶ 17; Dkt. 113 ¶ 17.) During the settlement process, the defendants represented to the mediator that Central States paid $320,000 of Shelby Haynes's medical bills. (Dkt. 108 ¶ 24.) In fact, DiCuccio received and then attached a "Medical Benefits Paid Spreadsheet," prepared by Central States, to the statement he sent to the mediator. *Id.* ¶¶ 25–26. The spreadsheet lists dates of service, service providers, amounts charged by service providers, and the amounts of those charges paid by Central States. *Id.* ¶ 27.

Payment processed shortly following settlement and DiCuccio deposited it in his trust account. (Dkt. 108 ¶¶ 18–19; Dkt. 113 ¶ 17.) Receiving no reimbursement, Central States sued Haynes and her co-defendants in this Court on August 30, 2017 to enforce its lien through the imposition of a constructive trust on the settlement proceeds in DiCuccio's account. (Dkt. 108 ¶ 21; Dkt. 113 ¶ 18.) The parties both moved for summary judgment: the Central States plaintiffs in February (Dkt. 96) and the Haynes defendants in March (Dkt. 102).

## STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019).  The parties genuinely dispute a material fact when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Section 502(a)(3) of ERISA authorizes plan fiduciaries, such as a board trustee, to bring civil suits "to obtain other appropriate equitable relief . . . to enforce . . . the terms of the plan."  29 U.S.C. § 1132(a)(3).  When a plan fiduciary seeks reimbursement for medical expenses after a plan beneficiary recovers money from a third party, the basis for the fiduciary's claim is equitable.  *See Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657 (2016).

Indeed, Central States' claim for reimbursement here turns out to be "the modern-day equivalent of an action in equity to enforce . . . a contract-based lien—called an 'equitable lien by agreement.'"  *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 95 (2013) (citing *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 364–65 (2006)).

Central States can therefore "bring an action under § 502(a)(3) seeking the funds that its beneficiar[y] . . . promised to turn over." *Id.*

Haynes and her co-defendants first and foremost argue that Central States has no equitable lien by agreement with Haynes. That is, there is no agreement (contract) between Central States and Haynes because Haynes is a so-called third-party beneficiary that never agreed to the Plan's terms. Second, the defendants contend that DiCuccio and his law firm are not proper parties to this lawsuit. Third, the defendants insist that the common fund doctrine should reduce Central States' claim, in addition to other remedial challenges to the lien amount.

## I.    Agreement between Central States and Haynes

Haynes stakes out the novel position that, as a "third-party beneficiary" to the health insurance contract, she is not bound by its terms. Points for creativity, Central States responds, but Haynes enrolled in the Plan, paid the premiums, and accepted benefits as a "covered dependent." As an initial matter, the terminology used by the parties to define Haynes's status calls for clarification. Starting with the statute, "[t]he term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8); *see Pennsylvania Chiropractic Ass'n v. Indep. Hosp. Indem. Plan, Inc.*, 802 F.3d 926, 928 (7th Cir. 2015).

An individual is thus a beneficiary if a plan participant designates her as one *or* if the Plan itself directly designates her to receive benefits. *See Ruttenberg v. U.S. Life Ins. Co. in City of New York, a subsidiary of Am. Gen. Corp.*, 413 F.3d 652, 661

(7th Cir. 2005). The typical beneficiary in an ERISA plan is the participant's spouse or child. *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 257 (2d Cir. 2015); *Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Wells*, 213 F.3d 398, 402 (7th Cir. 2000); *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 551 (7th Cir. 1997).

In this case, Shelby Haynes is Jeffrey Haynes' daughter. Jeffrey Haynes, indisputably a plan "participant" as ERISA defines that term in § 1002(7), designated Shelby Haynes as a person to receive health benefits under the Plan. Dkt. 121 ¶ 5; *see Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991). Shelby Haynes did not just have a colorable claim to vested benefits, she unquestionably received benefits from Central States. *See Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 878 (7th Cir. 2001). She is therefore a beneficiary under § 1002(8) of ERISA.

Moving to the context of the parties' agreement, the Plan states in Article 1.22 that a dependent is a "Participant's Spouse or Qualified Same-Sex Domestic Partner or Child." (Dkt. 98-2 at 14.) In turn, the Plan says in Article 1.17 that a *covered* dependent is a "Dependent who qualifies for Coverage under this Plan in accordance with the provisions of Article III of this Plan." *Id.* Article III, namely 3.02, goes on to explain that an individual becomes a covered dependent "when the person upon whom he is dependent is considered a Covered Participant provided the Covered Participant has elected the dependent coverage option under his plan." *Id.* at 19. When covered dependent status applies to a child, it commences "on the date such status as Child begins or on the date the Participant becomes a Covered Participant, whichever

occurs later, provided the Covered Participant has elected the dependent coverage option under his plan." *Id.* at 27.

Here, Shelby Haynes is certainly the Participant's (Jeffrey Haynes's) child. That makes her a dependent. She generally qualifies for coverage because Jeffrey Haynes is (or was) a Covered Participant that elected the dependent coverage option under his plan. (Dkt. 121 ¶ 5.) More specifically, in the circumstances of coverage for children, the Plan started covering Shelby Haynes as soon as her father enrolled their family. Accordingly, she is a covered dependent under the terms of the Plan. *See, e.g.*, *Mahrt v. Plumbers' Local #63*, No. 93-1389, 1994 WL 930438, at *4 (C.D. Ill. Oct. 14, 1994).

Ending with contract law, a "third-party beneficiary is someone whom the contracting parties wanted to have the right to enforce the contract." *Thomas v. UBS AG*, 706 F.3d 846, 852 (7th Cir. 2013) (collecting cases). In other words, if two parties enter into a contract "for the direct benefit of a third person who is not a party to the contract, that person may sue on the contract as a third-party beneficiary." *City of Yorkville ex rel. Aurora Blacktop Inc. v. Am. S. Ins. Co.*, 654 F.3d 713, 716 (7th Cir. 2011) (citing *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498, 501 (Ill. 1931)).

In Illinois:

> The test is whether the benefit is direct, in which case the person may sue, or incidental, in which case the person may not. The intent to benefit the third party must affirmatively appear from the language of the contract. If the intent to benefit others is not explicitly provided for in the contract, "its implication at least 'must be so strong as to be practically an express declaration.'" The parties' intent is to be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution.

*Id.* at 716–17 (internal citations omitted); *see also Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 820 (7th Cir. 2018). It follows, then, that "Illinois courts tend to find third-party beneficiary status where an agreement contains language to the effect that the surety will be responsible to third parties if the contractor is unable to fulfill its obligation to them." *Id.* at 717.

Applying these principles to this case, Jeffrey Haynes and Central States contracted, at least in part, for the direct health benefits of a third person who is not a technical party to the contract: namely, Shelby Haynes. *See, e.g., Lopez v. Reliance Standard Life Ins. Co.*, No. 515CV00125RLVDCK, 2016 WL 3191242, at *5–6 (W.D.N.C. June 3, 2016); *Donald v. Liberty Mut. Ins. Co.*, 18 F.3d 474, 481 (7th Cir. 1994) (discussing third-party beneficiary health insurance contracts).

The parties' intent to benefit Shelby Haynes affirmatively appears in the language of the Plan and Jeffrey Haynes's enrollment of Shelby in it. As stated previously, the Plan generally cognizes that a covered participant's children will be covered dependents, so long as the covered participant elects the dependent coverage option under his plan, which Jeffrey Haynes clearly did. (Dkt. 121 ¶ 5.) That is just as true broadly speaking as it is in the more limited setting of the reimbursement and subrogation provision that makes Shelby Haynes responsible to third parties.

That Shelby Haynes is a third-party beneficiary does not necessarily mean that she is not bound by the terms of her health insurance contract. Quite the contrary, "a third-party beneficiary has the duties as well as the rights of a signatory to the contract." *Wenfang Liu v. Mund*, 686 F.3d 418, 421 (7th Cir. 2012), *as amended* (July

27, 2012) (citing in part Restatement (Second) of Contracts § 309(4) (1981)); *see* Restatement (Second) of Contracts § 309 cmt. c ("The conduct of the beneficiary, however, like that of any obligee, may give rise to claims and defenses which may be asserted against him by the obligor, and his right may be affected by the terms of an agreement made by him."). Put differently, a "third-party beneficiar[y] . . . [is] bound by the terms and conditions of the [c]ontract[ ]." *Holbrook v. Pitt*, 643 F.2d 1261, 1273 (7th Cir. 1981) (internal citations omitted); *see Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 594 (7th Cir. 1993).

Not surprisingly, this canon of contract law appears both explicitly and implicitly in decisions under ERISA dealing with third-party beneficiary health insurance contracts. As it happens, the Supreme Court's relevant jurisprudence is predicated on scenarios where a covered individual received a tort settlement related to an injury, and under the ERISA plan's terms, the Fund sought reimbursement for the medical expenses it paid connected to that injury. *See McCutchen*, 569 U.S. at 92 (participant); *Sereboff*, 547 U.S. at 359 (participant *and* beneficiary—the participant's spouse).

Both the plaintiffs in *Sereboff*, for instance (including the beneficiary), expressly agreed in their insurance policies to reimburse their insurer for the benefits it paid if the plaintiffs recovered money from a third party to compensate for their injuries. *See Sereboff*, 547 U.S. at 359. Absent such a promise by the beneficiary to reimburse the plan, the Supreme Court would not have had reason to hold that it created an equitable lien by agreement. Because, as the Court later put it, "that kind

of lien—as its name announces—both arises from and serves to carry out a contract's provisions. So enforcing the lien means holding the parties to their mutual promises." *McCutchen*, 569 U.S. at 98 (internal citations omitted). In sum, without the agreement to reimburse the plan in *Sereboff*, there could have been no equitable lien by agreement.

The Fifth Circuit analogized the plan provision between the beneficiary and the fiduciary in *Sereboff* to a "contract to convey a specific res once it was received . . . This contract 'created a lien' on the specific assets to be conveyed under the contract. It was this provision . . . the contract between beneficiary and fiduciary to convey specified funds upon receipt . . . that created the equitable lien . . ." *Cent. States, Se. & Sw. Areas Health & Welfare Fund ex rel. Bunte v. Health Special Risk, Inc.*, 756 F.3d 356, 365 (5th Cir. 2014).

Not to put too fine a point on it, the Third Circuit and a district court in this Circuit have similarly reasoned. In *McLaughlin v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, the Third Circuit stated that "the relationship of a participant and eligible dependent is born of and encompassed within contract, namely the Plan documents." 686 F. App'x 118, 123 (3d Cir. 2017) (expounding further that the plan participant and beneficiary were in privity of contract). Correspondingly, in *OSF Healthcare Sys. v. Insperity Grp. Health Plan*, the district court asserted that "an ERISA beneficiary makes his contract with a plan," and "[b]eneficiaries contract with plans to receive benefits." 82 F. Supp. 3d 860, 863–64 (C.D. Ill. 2015) (referring to it again as "the original contractual relationship created between beneficiary and

plan."). The court concluded that beneficiaries under ERISA are third-party benefi-
ciaries under the common law of contracts. *See id.* at 864.

Like those courts, other federal courts are in lockstep with *Sereboff*'s premise
that third-party beneficiaries (covered dependents) are contractually bound by the
terms, such as a reimbursement provision, of their health insurance policies. *See
Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340, 347 (5th Cir. 2017);
*JDA Software Inc. v. Berumen*, No. CV-14-01565-PHX-DLR, 2016 WL 6143188, at *3
(D. Ariz. Oct. 21, 2016); *Oregon Teamster Employers Tr. v. Hillsboro Garbage Dis-
posal, Inc.*, 800 F.3d 1151, 1160 (9th Cir. 2015); *Cent. States, Se. & Sw. Areas Health
& Welfare Fund v. Bollinger, Inc.*, 573 F. App'x 197, 203 (3d Cir. 2014); *Food Employ-
ers Labor Relations Ass'n & United Food & Commercial Workers Health & Welfare
Fund v. Dove*, No. CIV.A. GJH-14-1273, 2014 WL 6388399, at *5 (D. Md. Nov. 13,
2014); *ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518, 526–28 (5th Cir. 2013) (en
banc) (collecting cases); *Rashiel Salem Enterprises LLC v. Bunton*, No. CV-11-08202-
PHX-NVW, 2013 WL 3581723, at *3 (D. Ariz. July 12, 2013); *J.T. ex rel. Thode v.
Monster Mountain*, LLC, 754 F. Supp. 2d 1323, 1326 (M.D. Ala. 2010) (quoting in part
*Hamrick v. Hosp. Serv. Corp.*, 110 R.I. 634, 296 A.2d 15, 17–18 (1972)); *Longaberger
Co. v. Kolt*, 586 F.3d 459, 468 (6th Cir. 2009) (abrogated on other grounds by *Mon-
tanile*,136 S. Ct. at 651); *Admin. Comm. of Wal-Mart Stores, Inc. Associates' Health
& Welfare Plan v. Gamboa*, 479 F.3d 538, 545 (8th Cir. 2007) (quoting *Health Cost
Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 712 (7th Cir. 1999)); *Kress v.
Food Employers Labor Relations Ass'n*, 391 F.3d 563, 570–71 (4th Cir. 2004); *Trustees*

*of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 782 (7th Cir. 2002); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 465–66 (7th Cir. 1998); *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1071 (6th Cir. 1997); *Cmty. Ins. Co. v. Richardson*, No. C- 3-96-98, 1997 WL 1526503, at *1 (S.D. Ohio Nov. 3, 1997), *aff'd*, 172 F.3d 872 (6th Cir. 1999); *Sunbeam-Oster Co. Grp. Benefits Plan for Salaried & Non-Bargaining Hourly Employees v. Whitehurst*, 102 F.3d 1368, 1370, 1375 (5th Cir. 1996); *Crawford v. Roane*, 53 F.3d 750, 756–57 (6th Cir. 1995); *Preze v. Bd. of Trustees, Pipefitters Welfare Fund Local 597*, 5 F.3d 272, 274 (7th Cir. 1993).

None of Haynes' contrary arguments are persuasive. She preliminarily attempts to evade liability by positing that Central States cannot force her to reimburse it because she never saw the Plan document. But, of course, she need not see the Plan itself—most insured do not. An insurer fulfills its duty of appraisal when it, for example, ensures covered individuals receive the SPD by posting it online and providing the link. *See, e.g.*, *Berumen*, 2016 WL 6143188 at *3 (internal citation omitted). Haynes "accepted the benefits and is bound by the terms of the plan unless [Central States] prejudiced [her] by its failure to disclose them." *AirTran Airways, Inc. v. Elem*, 767 F.3d 1192, 1200 (11th Cir. 2014), *cert. granted, judgment vacated on other grounds*, 136 S. Ct. 979 (2016).

Notwithstanding any potentially prejudicial nondisclosure, Haynes was on notice of Central States' intent to pursue reimbursement because it sent her a letter—attaching an itemization of the medical expenses it paid for her and the subrogation section of the Plan—in January 2014. (Dkt. 110 ¶ 11.) Moreover, she allowed Central

States to pay over $312,000 of her medical bills. *Cf. Caesars Entm't Operating Co., Inc. on behalf of Harrahs Operating Co., Inc. v. Johnson*, No. 3:13-CV-00620-CRS, 2015 WL 5020695, at *6 (W.D. Ky. Aug. 24, 2015) (taking benefits constitutes an agreement to reimburse the plan from any third-party recovery). So, Haynes knew of Central States' lien and "cannot avoid liability on a technicality." *Id.* at 1201 (internal citation omitted).

Haynes also makes much of the "third party" in her "third-party beneficiary" status, as if that means she is just a "third party" unrelated to this transaction and occurrence. She cites *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 157 (2d Cir. 2014), and *Health Special Risk, Inc.*, 756 F.3d at 365 (illustrated earlier in this opinion), in support. Those cases, however, are inapposite because they recognize that they do not apply when "plan terms constitute[ ] a contract between the parties involved in the . . . dispute[ ] between the plan and one of its beneficiaries." *Gerber Life Ins. Co.*, 771 F.3d at 156. Haynes, an insured and plan beneficiary, cannot seriously equate herself with Gerber, an *additional* insurer standing in the same shoes as Central States. Simply put, there is a world of difference between a third-party provider and a third-party beneficiary. *Cf. Pennsylvania Chiropractic Ass'n v. Indep. Hosp. Indem. Plan, Inc.*, 802 F.3d 926, 928 (7th Cir. 2015).

Having received medical benefits under the plan, Haynes may not now "deny the corresponding responsibilities and obligations that are clearly imposed on [her] in the same document[.]" *Gamboa*, 479 F.3d at 545. To permit Haynes to deny her

responsibility to reimburse would allow her "to reap the pure windfall here sought to the potential prejudice of other beneficiaries." *Mathews v. Sears Pension Plan*, 144 F.3d 461, 469 (7th Cir. 1998). It is a windfall because a covered dependent not bound to this subrogation clause would recover both from the insurer and the tortfeasor for the same injury. *See J.T. ex rel. Thode*, 754 F. Supp. 2d at 1326.

In short, a third-party beneficiary cannot accept the benefits of a contract while rejecting its burdens. *See id.* The Fund must serve the best interests of all covered Plan individuals, not just Haynes, so it was right to seek to recover the benefits it paid to provide for future participants who may find themselves in unfortunate circumstances not unlike Haynes's. *See Kress v. Food Employers Labor Relations Ass'n*, 391 F.3d 563, 570–71 (4th Cir. 2004). In the end, the Plan contractually binds Haynes under its subrogation clause.

## II.   DiCuccio and Law Firm as Defendants

Switching gears, the issue now becomes one of remedy rather than right. That is, the Fund is entitled to a refund, but questions remain regarding the payer of the refund and its ultimate amount. The Court focuses on those matters now, beginning with whether Haynes's counsel in the underlying medical malpractice lawsuit (and his law firm) are proper parties in this ERISA case. The defendants say no because Central States did not agree to anything with Haynes's lawyers in the Plan. Central States replies that DiCuccio and his firm possess the settlement proceeds—which the Court has equity jurisdiction to reach—making them appropriate defendants.

ERISA, by its own terms, allows lawsuits against nonplan defendants. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000) ("§ 502(a)(3) admits of no limit . . . on the universe of possible defendants."); *see also Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1208 (10th Cir. 2019); *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 916 (7th Cir. 2013). It naturally flows from that proposition that an individual attorney or law firm that holds disputed settlement funds on behalf of a plan participant or beneficiary need not be party to the plan to be subject to suit under ERISA. *See Wells*, 213 F.3d at 401; *see also ACS Recovery Servs., Inc.*, 723 F.3d at 524–25 (illustrating and abrogating in part on other grounds *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 352–53 (5th Cir. 2003)); *Longaberger Co.*, 586 F.3d at 468 (holding that "there is no statutory barrier that prevents [the plan participant's attorney] from being a defendant in a suit brought pursuant to § 502(a)(3) of ERISA, provided that the relief sought lies in equity.").

Here, DiCuccio and his firm fit the mold: they served as counsel for Haynes in the underlying medical malpractice settlement and they still possess the disputed funds on Haynes's behalf. That makes them amenable to suit under ERISA. For that reason, Central States rightly named DiCuccio and his firm as defendants in this litigation.

## III. Common Fund Doctrine and Issues with the Lien Amount

Pivoting to the remaining remedial issues, all the defendants' contentions here pertain to calculating the lien amount correctly. The defendants maintain that

Central States' claim should be reduced based on the: (1) common fund doctrine; (2) superiority of their attorney's fees lien; (3) effective date of the lien; and (4) failure to adequately support the total amount of the lien. One by one, the Court tackles each of these challenges.

## A.    Common Fund Doctrine

From the top, Haynes and her attorneys aver that Central States' claim should be reduced by the "common fund doctrine," meaning the proportionate amount of Haynes's attorney's fees and expenses in the underlying medical malpractice case. *See McCutchen*, 569 U.S. at 96 (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)); *Wells*, 213 F.3d at 401–02. Haynes "urges that this doctrine, which is designed to prevent freeloading, enables [her] to pass on a share of [her] lawyer's fees to [Central States], no matter what the plan provides." *McCutchen*, 569 U.S. at 96.

An equity court, however has no "'inherent authority' to apportion litigation costs in accord with the 'longstanding equitable common-fund doctrine,' even if that conflicts with the parties' contract." *Id.* at 99 (internal citation omitted). In no uncertain terms, "the agreement governs[.]" *Id.* On cue, the Court looks to the contract's terms because the "agreement itself becomes the measure of the parties' equities; so if a contract abrogates the common-fund doctrine, the insurer is not unjustly enriched by claiming the benefit of its bargain." *Id.* at 100. Should the express contract term contradict the background equitable rule, the agreement controls; by contrast, if the plan provision leaves space (a "contractual gap") for the common-fund doctrine to operate, then it shall operate because that doctrine "provides the best indication of the

parties' intent . . . in the absence of a contrary agreement." *Id.* at 103–04; *see In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 746 (7th Cir. 2018) (internal citation omitted).

In this case, the Plan states: "<u>The Fund's Subrogation Rights are not in any way subordinate to or affected by any 'common fund' principle or factor</u> . . . <u>the acceptance of plan benefits from the Fund entirely subordinates the Loss Recovery Rights of the Covered Individual to the Subrogation Rights of the Fund (without any 'common fund' reduction</u> . . .)" (Dkt. 121 ¶ 9 (emphasis in original).) The plain language of this Plan provision abrogates the common-fund doctrine's application to Haynes. There is no contractual space or gap left for the common fund doctrine to operate in. The agreement governs.

The SPD is in accord.[1] (Dkt. 121 ¶ 11 ("The Plan is entitled to full reimbursement, from your settlement or other recovery, of all of its benefit payments for care and treatment of injuries. That full reimbursement is not reduced by any attorneys' fees or other costs you incur in obtaining your settlement or other recovery.").)

---

[1] Much ink has been spilled over the defendants' objection to Central States' "late" production of the SPD that was in effect at the time of the settlement in the medical malpractice case. (Dkt. 112 at 8 n.6; 120 at 5–6; 122; 124; 125.) The Court overrules the objection principally because the issue is largely moot seeing that there is no direct conflict between the statements in *any* version of the SPD and the terms of the Plan. To that end, *no* SPD controls the outcome of this litigation; instead, it falls on the plain language of the Plan. It is also worth noting that it was the defendants who requested the SPD that was effective at settlement and the only potentially relevant difference between the two versions is what headings Central States organized the fees provisions (including the common fund doctrine) under. To be clear, the attorney's fees provisions appeared in each SPD and the SPDs are otherwise identical, so there was no ERISA disclosure violation. It is not at all hard to believe that, on first blush, counsel for Central States did not notice this Scrivener's error.

Therefore, both the Plan and SPD lay out the circumstances that may result in Central States' recovery of benefits by subrogation.

Assuming for the sake of argument that the SPD was silent on the issue of subrogation and the attendant common fund doctrine, that does not estop Central States from enforcing the Plan's terms because that only occurs when there is a direct conflict between the SPD and the Plan. *See McCutchen*, 569 U.S. at 92 n.1 (clarifying that the SPD does not constitute the Plan's terms); *Mers v. Marriott Int'l Grp. Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1023–24 (7th Cir. 1998) (citing *Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 983 (7th Cir. 1992); then collecting cases); *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1136 (10th Cir. 1998) (collecting cases).

The defendants failed to identify any conflict between the Plan's subrogation terms and the SPD's subrogation provisions. For good reason, too, because the two documents are in sync: both require the full satisfaction of a subrogation lien without any attorney's fees reduction. That the SPD does not use the term "common fund" is not enough to create a conflict. In a nutshell, the contract rules here, and the common-fund doctrine cannot override it.

### B. Attorney's Fees Lien

Suffering the same fate as the common fund doctrine is DiCuccio and his firm's claim that their attorney's fees lien on the settlement proceeds is superior to the Fund's subrogation lien. As mentioned before, there is no freestanding attorney's fees exception to a contract's terms. *See McCutchen*, 569 U.S. at 100. A court should not

downgrade a plan's lien on funds recovered from third parties when the plan's language indicates that the lien has priority over others. *See Longaberger Co.*, 586 F.3d at 471–72 (citing *Ward v. Wal-Mart Stores, Inc.*, 194 F.3d 1315, *4 (6th Cir. 1999); then citing *Isbell*, 139 F.3d at 1072).

Here, the Plan provides that "[t]he Fund is entitled to receive payment and reimbursement in the full amount of the Fund's Subrogation Rights before the Covered Individual receives any Proceeds in full or partial satisfaction of his/her Loss Recovery Rights *and before any fees or expenses are paid, including attorneys' fees*." (Dkt. 108 ¶ 9 (emphasis added).) Given its most literal and natural reading, the Plan requires full reimbursement of benefits paid. That is another way of saying that the contract establishes that the Fund's subrogation lien is superior to any other lien. The Court cannot deduct attorney's fees from the amount due to Central States.

### C.    Effective Date of the Lien

The defendants' next theory of reduction is that Central States' subrogation lien arose on the date the defendants received notice of the lien: January 13, 2014. The defendants apparently request a reduction of the lien amount because they think Central States delayed giving notice, and consequently it should not recoup the benefits it paid prior to notice. Central States believes the lien should not be reduced because it had subrogation rights from the moment it covered Haynes's medical expenses and the defendants were on notice of the lien with plenty of time to spare.

As a matter of law, an equitable lien by agreement attaches to a settlement fund as soon as that fund arises from the injuries requiring plan payments. *See*

*Montanile*, 136 S. Ct. at 556; *Sereboff*, 547 U.S. at 364–64 (quoting *Barnes v. Alexander*, 232 U.S. 117, 123 (1914)); *see also ACS Recovery Servs., Inc.*, 723 F.3d at 526–27 (internal citation and quotation omitted) (collecting cases); *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 194 (3d Cir. 2011); *Longaberger*, 586 F.3d at 466–67.

As a matter of fact, the Plan specifies that "[t]he Fund, whenever it makes any payment for any benefits on behalf of a Covered Individual or other person related to any illness, injury or disability (collectively and separately "Disability") of the person, is *immediately subrogated* and vested with subrogation rights ("Subrogation Rights") to all present and future rights of recovery . . ." (Dkt. 108 ¶ 4 (emphasis added).) Although the Plan gave the Fund instant subrogation rights upon payment, those rights did not vest (in the form of an equitable lien attaching to the settlement fund) until the fund arose.

Therefore, Central States had subrogation rights from the time it paid Haynes's medical benefits; the defendants were aware of Central States' lien since early 2014; and Central States' lien became effective when the settlement fund arose. The Court rejects the defendants' request to reduce the lien amount because of a delay.

### D.      Adequate Support of the Total

Finally, the defendants claim that Central States failed to support the total amount of its lien. Central States counters that the evidence demonstrates that it paid all the medical expenses incurred by Haynes. It is common ground between the parties that Central States paid some of the medical expenses resulting from the

injuries Haynes sustained during her first surgery. (Dkt. 108 ¶¶ 14, 29, 32; Dkt. 110 ¶ 2; Dkt. 113 ¶ 4.) The defendants' purported disagreement instead centers on what the exact number is.

Central States justifies its lien amount with an affidavit from an executive officer of the Fund with knowledge of the payments. (Dkt. 98-1 ¶¶ 14–15.) What is more, the defendants themselves represented to a mediator in the underlying medical malpractice case that Central States paid $320,000 of Shelby Haynes's medical bills. (Dkt. 108 ¶ 24; *see id.* ¶ 25.) Substantiating this figure is a detailed spreadsheet— prepared by Central States and delivered to DiCuccio in the malpractice case—listing dates of service, service providers, amounts charged by service providers, and the amounts of those charges paid by Central States. *Id.* ¶¶ 26–27.

The defendants merely state that Central States needs to show more than they have shown to prove that figure. But it is the defendants who failed to rebut the evidence in the record that this number is accurate. Their blanket assertion that Central States needs to do more is not an adequate response under either Federal or Local Rule 56. *See* Fed. R. Civ. P. 56(c)(1)–(2); L.R. 56.1(b)(3)(B). The defendants needed to provide evidence that shows that $312,286.50 is inaccurate and they neglected to do so.

## CONCLUSION

All told, Haynes's health insurance contract binds her to its terms, so she must comply with its subrogation provision and reimburse Central States for the benefits it paid for her because the settlement of her malpractice claim created an equitable

lien by agreement between the parties. The Court accordingly grants Central States'

motion (Dkt. 96), denies the defendants' cross-motion (Dkt. 102), and enters summary

judgment for Central States in the amount of its outstanding lien: $312,286.50. To

enforce that lien, the Court imposes a constructive trust on the settlement fund held

by DiCuccio and his firm. After judgment, Central States may provide evidence es-

tablishing the amount of interest on the lien in addition to the amount of outstanding

attorney's fees and costs under Local Rules 54.1 and 54.3.


_____
Virginia M.  Kendall
United States District Judge

Date: July 19, 2019